UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CYNTHIA HINES,

           Plaintiff,                        No. 19-13390

v.                                   Honorable Nancy G. Edmunds

SHERWOOD FOOD DISTRIBUTORS,

           Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [11]**

This matter is before the Court on Defendant Sherwood Food Distributors' motion for summary judgment. (ECF No. 11.) Plaintiff filed a response. (ECF No. 16.) Defendant filed a reply. (ECF No. 17.) Having reviewed and considered the parties' briefs and supporting evidence, the Court has determined that the allegations, facts, evidence and legal arguments are presented adequately in the written submissions so that oral argument would not significantly aid the Court's decision. For these reasons, the Court will decide the matter without a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

I.      **Background and Facts**

Plaintiff Cynthia Hines ("Plaintiff") is an African American woman who was employed by Defendant Sherwood Food Distributors ("Defendant" or "Sherwood Foods"), a Detroit-based national food distributorship with locations around the country. (Compl. ¶¶ 7, 8; ECF No. 1.) Plaintiff alleges that during the tenure of her employment with Defendant, she faced discrimination because of her race and was retaliated against for

1

reporting this conduct. (Compl. ¶ 93; Pl.'s Resp. 7, ECF No. 16; Hines Decl. ¶ 25, Pl.'s Resp. Ex. D, ECF No. 16-4.) Plaintiff applied for employment with Defendant on approximately October 17, 2017, when she completed and signed an Application for Employment (the "Application"). (Hines Dep. 38, Def.'s Mot. Ex. D, ECF No. 11-5; Application, Ex. C, 11-4.) Plaintiff was hired as a temporary employee in a support role in the Human Resources ("HR") department in November 2017 and hired as a full-time employee[1] in March 2018. (Compl. ¶ 7, ECF Nos. 1, 11-2; Hines Dep. 38:11-12, 40:18-19, 42-43, Pl.'s Resp. Ex. A, ECF No. 16-1.) While employed at Sherwood Foods, Plaintiff worked directly under supervisor Shana Smith[2] (hereinafter "Holcomb-Smith"), who is also African American. (Hines Dep. 40, 43, ECF No. 16-1; Hines Decl. ¶ 25, ECF No. 16-4.) When Plaintiff became a permanent employee, she received a one-dollar-per-hour pay increase. (Hines Dep. 43:18-20, ECF No. 16-1.)

On June 29, 2018, after Plaintiff became a permanent employee, Holcomb-Smith sent an email to Colleen Donehue stating: "Cynthia and I have gone over the attached job description. I have highlighted the items that are outstanding for us to work on. Starting Monday, July 2nd, we will spend 1-2 hours daily training, and working toward her performing the full job description." (Pl.'s Resp. Ex. B, ECF No. 16-2.) Attached to the

---

[1] The parties use the terms "full-time" and "permanent" interchangeably. (*See, e.g.*, Compl. ¶ 7, Hines Dep. 43:2-5, Def.'s Mot. 4.)

[2] Shana Smith has also been referred to in the documents and pleadings as "Shana Holcomb" or "Holcomb-Smith," and has signed some documents as "Shana Holcomb" (*see e.g.*, ECF No. 11-7) but she testified that her last name is "Smith." (Holcomb-Smith Dep. 9, ECF No. 16-3.)

email was a four-page Job Description for "HR Support WH Analyst," signed by Plaintiff and dated June 29, 2018.[3] (*Id*.)

Holcomb-Smith testified in agreement when asked if she spent "five to ten hours a week, . . . . every week, starting July 2nd, with [Plaintiff], training and working towards her performing the full job description." (Holcomb-Smith Dep. 56:12-16, ECF No. 16-3.) Holcomb-Smith is unaware of any documentation that would show that this training took place. (Holcomb-Smith Dep. 57-58.) Plaintiff testified that after she started as a full-time employee, Holcomb-Smith was training Plaintiff when Holcomb-Smith had time.[4] (Hines Dep. 46:9, ECF No. 16-1.)

Until May 2018, Plaintiff worked approximately 12 hours of overtime per week, but after May 2018, her overtime hours were cut to two hours per week. (Hines Dep. 50:18-24.) Plaintiff testified that Shana and Colleen told her that the company was not able to pay the overtime and they felt that she should be able to do the job in the eight-hour time frame. (Hines Dep. 51:1-4.)

Though there were other HR employees in the Detroit location at this time with whom Plaintiff worked, Plaintiff was the only employee supervised by Holcomb-Smith. (Hines Dep. 51.) Plaintiff testified that Holcomb-Smith would refer to herself as the "Queen

---

[3] In her response brief, Plaintiff relies on this email to argue that "it is uncontroverted that, at least as of late June of 2018 – over a year into her employ – Plaintiff had not been trained to perform all of the tasks of her job." (Pl.'s Resp.6, ECF No. 16.) This is simply not accurate. Plaintiff started her employment with Defendant in November 2017, the email addressing the need for additional training was dated June 29, 2018, approximately seven months later, not "over a year into her employ."

[4] In her response brief, Plaintiff also points out that "Plaintiff testified that she was not even allowed to attend the weekly human resources ("HR") meetings . . . ," yet Plaintiff's testimony in full when asked "Did you attend weekly H.R. meetings?" was: "No, it was only for the managers." (Hines Dep. 135:15-16.)

B****, and on one occasion did so when Plaintiff and Holcomb-Smith met with an HR generalist identified as "Angelina."[5] (Hines Decl. ¶¶ 7-10.) Plaintiff speculated that Holcomb-Smith called herself this to "keep [Plaintiff] in line" and to "maintain Shana's power dynamic as the most powerful black female in the office." (Pl.'s Resp. 7, citing Hines Decl. ¶¶ 9-10.)

Despite Plaintiff having a master's degree, Holcomb-Smith questioned Plaintiff's educational credentials. (Holcomb-Smith Dep. 116:10-11.) Plaintiff testified that Holcomb-Smith said, "For you to be black, young and black, do you have – you have a bachelor's degree, not a master's degree, right?" and Holcomb-Smith pointed to her own skin as she said "black." (Hines Dep. 140:13-22.) It is this incident and comment that Plaintiff identified as the offensive communication about her race. (Hines Dep. 140.) Plaintiff was the only employee whose education credentials were questioned. (Holcomb-Smith Dep. 116-17, ECF No. 16-3.) Colleen Donehue contacted Plaintiff's school, which verified Plaintiff's degree. (Holcomb-Smith Dep. 116.) Holcomb-Smith testified that they questioned her degree based on her work performance. (Holcomb-Smith Dep. 117.) In her deposition, Plaintiff could not think of other examples of offensive communication or conduct because of her race or national origin, that made her believe she was subjected to an intimidating, hostile or abusive work environment. (Hines Dep. 140-41.) Plaintiff does not remember whether she mentioned this comment when she complained about the situation to Dawn or Angelina. (Hines Dep. 141.)

---

[5] There is an Angelina Greenard identified as a general manager and mentioned in the Complaint at paragraph 15.

Plaintiff testified that she felt she had to do personal errands for Holcomb-Smith, including getting her breakfasts and lunches, which occurred in the context of Plaintiff being written up for missing a deadline. (Hines Decl. ¶ 13, ECF No. 16-4.) She alleges that no white employee was "forced to run errands or get food for their employer, and this also helped to maintain [Holcomb-Smith's] ideal power dynamic." (Hines Decl. ¶ 15.) Plaintiff stated in her declaration that "[s]hortly after I began complaining to H.R. about Shana's [Holcomb-Smith] treatment of me, my workload increased, hours decreased, and I began to receive write-ups." (Hines Decl. ¶ 34.) Plaintiff also stated that she had to take work home to complete before Holcomb-Smith returned to work by 7 a.m. the following day yet was not receiving overtime pay. (Hines Decl. ¶ 20.)

Plaintiff states in her declaration that she "was declined" the $40,000 salary that she was supposed to have received after she completed a 30-day probation period "due to her race," but non-African American employees, "such as Pricilla Cacuchi and an ex-employee I cannot think of the name of were also promised this raise after their probationary period, and they received this raise sometimes even before their probationary period ended." (Hines Decl. ¶¶ 23, 24.)

The parties have a factual dispute regarding the issue of Plaintiff's start-time at work and whether and to what extent this factored into disciplinary steps. Plaintiff testified that she notified Holcomb-Smith that she could not come to work early because she had to drop her kids off at school. (Hines Dep. 103, ECF No. 16-1.) That much is clear. Here is Holcomb-Smith's testimony on the matter:

Q: Did – okay. So at some point, did you request that my client come in at 7 a.m.?
A: Yes.
Q: And what was her response?

A: That she couldn't do it, because her husband needed her to drop off the kids.

Q: So were you ever expecting her to come in at 7 a.m.?

A: Yes.

Q: Despite the fact she said she can't do it because she has to take care of her kids.

A: Initially, when she was brought in as a temp, she was working a 7 a.m. schedule and her kids started school, notified us that she'd only be able to do it Monday and Tuesday, and then it changed from – to not being able to do it at all. So yes, I did expect her to come in on payroll days, Monday and Tuesday, at 7 a.m.

Q: . . . Did she ever give you reason to believe that she would be coming in on payroll dates at 7 a.m. or --

A: Yes.

Q: Okay. And what did she say to you?

A: She would come in. She would be there at 7 a.m.

Q: And is it your testimony that she did not come in at 7 a.m.?

A: No. She would come in at 7 a.m., but she changed it.

(Holcomb-Smith Dep. 118-20, ECF No. 16-3.) Holcomb-Smith went on to testify that they accommodated the time changes and pushed back the times for payroll, and that there was no discipline for showing up after 7 a.m. once they changed her schedule, but she was written up, for example, when "[s]he would be asked to be there at 8 and sometimes she get there at 8:30 or 8:45" and this was discussed in the "9-21-18 review," described as a "Performance Improvement Review." (Holcomb-Smith Dep. 120-21.) The September 21, 2018 "supervisor feedback" notes state, in addition to other details, that "[t]his position requires someone who can report Monday and Tuesday with a start time 7:00am." (Performance Improvement Follow-up, ECF No. 11-9.) In her declaration, Plaintiff stated that "the white H.R. analyst and assistant who work in the main administration building

are routinely late to work and do not finish their tasks in time, but they were still employed and I was fired for because (sic) of those things." (Hines Decl. ¶ 31.)

Plaintiff testified that when she made a complaint to the managers about Holcomb-Smith, she heard "plenty of stories . . . from upper managers that she's very difficult to work with," but she did not really know the nature of whether or not Holcomb-Smith was difficult to work with for both black and white employees, and was unable to name any prior individuals that Holcomb-Smith had fired or sought to fire. (Hines Dep. 58-59.) Plaintiff testified that managers had warned her to watch her back "when they noticed some stuff was going on between" Plaintiff and Holcomb-Smith. (Hines Dep. 58-59.) In her declaration, Plaintiff explained that she understood this as relating to her race because she needed to be "flawless" or else she would be fired. (Hines Decl. ¶¶ 11-12.)

Plaintiff makes general allegations that she complained of and/or reported Holcomb-Smith's actions to managers and others. Aside from an allegation in the Complaint[6], the only time frame given for such reporting or a somewhat specific listing of people to whom Plaintiff reported this appears in Plaintiff's May 18, 2019 charge of discrimination filed with the EEOC. In there, Plaintiff states, "In August 2018, I made a complaint to the General Manager and the Benefits Manager that I believe my Supervisor was discriminating against me based upon my race, African American." (Pl.'s Resp. Ex. F, ECF No. 16-6.) Plaintiff stated in her own declaration that she "had several conversations informed (sic) the HR Generalist Angeline & Dawn the Benefit Manager of Shana wrong doing (sic) behavior toward me which (sic) nothing was done." (Hines Decl.

---

[6] "On several occasions in May of 2018, Plaintiff reached out to her general manager, Angelina Greenard, about how Holcomb had been treating her unfairly and making comments to her that Holcomb was the "queen b****."" (Compl. ¶ 15, ECF No. 1.)

¶ 13.) Plaintiff was never interviewed or contacted about her complaint(s) to HR. (Hines Decl. ¶ 35.)

The record contains a 90 Day New Hire Evaluation dated July 13, 2018, written Employee Performance Records ("EPRs") dated August 20, 2018, September 18, 2018, and October 3, 2018 (termination), as well as a "30 Day Performance Improvement Follow-Up" dated September 21, 2018, in which "30" has a line drawn through it, all discussed in further detail below. (ECF Nos. 11-7, 16-5, 11-8, 11-9, 11-10.)

Plaintiff's employment was terminated on October 3, 2018. (Compl. ¶ 39.) It is unclear who made the decision to terminate Plaintiff. Defendant alleges that the decision to terminate Plaintiff was made by Holcomb-Smith and approved by Colleen Donehue and Dawn Howarth, and cites the Employee Performance Record in support, yet this document is signed by Holcomb-Smith and Angelina Greenard and the substance of the document does not actually indicate who was responsible for, or approved, the decision. (Def.'s Mot. 6, ECF No. 11; Ex. I, ECF No. 11-10.) Holcomb-Smith testified that Colleen Donehue instructed her to terminate Plaintiff. (Holcomb-Smith Dep. 86:21-22.) Plaintiff testified that she was not given this document before she was terminated from Sherwood Foods; she was told by Holcomb-Smith and Greenard that they were going to "part ways" with her and she was told to log out of her computer and exit the building. (Hines Dep. 130-32, ECF No. 16-1.)

Based upon her own declaration, Plaintiff states that in November 2018 she filled out an intake questionnaire at the Equal Employment Opportunity Commission (EEOC). (Hines Decl. ¶ 1, Pl.'s Resp. Ex. D, ECF No. 16-4.) On May 13, 2019, Plaintiff filed a Charge of Discrimination with the EEOC alleging discrimination based on race and

retaliation. (Charge of Discrimination, Def.'s Mot. Ex. J, ECF No. 11-11.) On July 18, 2019, the EEOC issued a right-to-sue letter.[7] (Compl. ¶ 41, ECF No. 1.) On October 16, 2019, Plaintiff commenced action in Wayne County Circuit Court and on November 18, 2019, Defendant filed a notice of removal in this Court. (ECF No. 1.) This Court remanded Plaintiff's state law claims to Wayne County Circuit Court.[8] (ECF No. 3.) The only claims remaining and at issue herein are: Discrimination based on race in violation of Title VII (count I); hostile workplace environment in violation of Title VII (count III); and retaliation in violation of Title VII (count V).

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must present some evidence in support of its complaint to defeat a motion

---

[7] The parties do not dispute that there exists a right-to-sue letter issued July 18, 2019, yet neither party has provided it; the complaint purports to have it attached at "exhibit A" and it is not on the Court's docket.
[8] The Court remanded state law claims in counts II, IV, VI, VII and IX. (ECF No. 3.) There is no count VIII. (Compl., ECF No. 1.)

for summary judgment and show that a genuine issue for trial exists— summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury ...." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (citation omitted). When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

III.    **Analysis**

    A.  **Whether Plaintiff's Claims Are Timely**

Defendant argues that all of Plaintiff's claims are barred by the six-month contractual limitations period in the Application. Plaintiff counters that Defendant cannot bind her to a contractual agreement without providing consideration and without informing her of the agreement. Plaintiff also argues that, should the limitation be applied, her intake questionnaire with the EEOC counts as a "charge" for purposes of Title VII and the six-month limitation at issue.

Section 12 of the Application provided that

It is agreed that arbitration shall be the sole mechanism for bringing a legal claim against the Company and/or the client for matters relating to

employment discrimination. Arbitration must be commenced with the American Arbitration Association within six (6) months of the date the claim arises and that judgment upon an award may be entered by any court of competent jurisdiction. If any portion of the agreement is determined to be unenforceable or invalid, this agreement shall still remain in full force and effect to the fullest extent allowable by law.

(Application for Employment, Def.'s Mot. Ex. C, ECF No. 11-4.)

First the Court must determine whether the agreement to arbitrate is enforceable and whether there exists a genuine dispute as to whether Plaintiff was bound by the six-month contractual limitation set forth in the Application.

### 1. Whether the Arbitration Agreement Is Enforceable

Plaintiff argues that she did not knowingly or voluntarily enter into the agreement to arbitrate. "A written agreement to arbitrate disputes arising out of a transaction in interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Hergenreder v. Bickford Senior Living Group, LLC*, 656 F.3d 411, 416 (6th Cir. 2011) (citation omitted). "In order to show that the validity of the agreement is 'in issue,' the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement to arbitrate." *Great Earth Companies, Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002).

Plaintiff relies on *Hergenreder v. Bickford Senior Living Group, LLC*, to set forth the factors the Court must consider when determining whether "a waiver of the right to a jury trial has been knowing and voluntary":

(1) [P]laintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

11

*Hergenreder*, 656 F.3d at 420-21 (citing *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003)); (Pl.'s Resp. 16-17, ECF No. 16). With respect to the first factor, Plaintiff argues that she had "no experience in law"—if this were the standard, arbitration agreements would not apply to anyone not versed in the law. In fact, Plaintiff has a master's degree in Human Resources. *See, e.g., Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 381 (6th Cir. 2005) (upholding district court determination that plaintiffs did not knowingly and voluntarily consent to arbitration, noting most of the plaintiff class had not completed high school, among other factors).

Plaintiff in her declaration stated that prior to Defendant filing its motion, she was not aware that she had signed an agreement to arbitrate any claims, she was unaware of what an employment arbitration agreement was, and "had no knowledge that this agreement was in the application with Sherwood Food[] Distributors." (Hines Decl. ¶¶ 2, 3; ECF No. 16-4.) The employment application at issue was only two pages, the arbitration agreement was one of only thirteen provisions on the second page under a bold and shaded box warning the applicant in all caps: "TERMS OF EMPLOYMENT-- PLEASE READ THE FOLLOWING CAREFULLY," and in her deposition, Plaintiff testified that she had filled out an application and that it was her signature on the second page of the application. (Application for Employment, Def.'s Mot. Ex. C, ECF No. 11-4; Hines Dep. 38:8-22, ECF No. 11-5.) "One who signs a contract cannot seek to avoid it on the basis that [s]he did not read it or that [s]he supposed it was different in its terms." *Mannix v. County of Monroe*, 348 F.3d 526, 533 (6th Cir. 2003). In affirming a decision that a plaintiff was bound by the terms of an employment application, the Sixth Circuit stated, "[Plaintiff]

had an obligation to seek assistance before she signed if she felt she did not understand the application." *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 461 (6th Cir. 1986).

Unlike other cases in which the arbitration provisions at issue were found in handbooks or documents specifically stating that they did not form a contract, here the Application for Employment specifically provides the arbitration provision under "Terms of Employment," using language several times such as "I agree." It was more than a general statement of what an employee could expect, it was clear and notified that arbitration was the "sole mechanism for bringing a legal claim. . . ." (ECF No. 11-4); *Cf. Hergenreder*, 656 F.3d at 420.

Plaintiff alleges there was no consideration for the waivers. Under Michigan law, "[t]he enforceability of a contract depends, . . . on consideration and not mutuality of obligation." *Timko v. Oakwood Custom Coating, Inc.*, 625 N.W.2d 101, 106 (Mich. App. 2001) (citing *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980) ("Here, defendant clearly provided plaintiff consideration to support enforcement of the terms of the application, specifically employment and wages."). Although Plaintiff argues that she had "already been offered employment, and had been working with Defendant as a temp for months," the application was signed in October 2017 and Plaintiff was hired as a temporary employee through Robert Half agency in November 2017 and later hired as a permanent employee. (Hines Dep. 38, 42, ECF No. 16-1.) There was sufficient consideration for the waiver, "specifically employment and wages." *Timko*, 625 N.W.2d at 106. The arbitration provision is enforceable. Next the Court must consider whether the 6-month time limitation is enforceable.

### 2.  Whether The Six-Month Limitation Is Enforceable

The Sixth Circuit in *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824 (6th Cir. 2019), considered "whether the statute of limitations of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e et seq., may be contractually shortened for litigation." *Id.*at 825. The Sixth Circuit held that the "limitation period of Title VII is part of an elaborate pre-suit process that must be followed before any litigation may commence" and "[c]ontractual alteration of this process,' such as the six month limitation period in *Logan* to bring any lawsuit against the employer, "abrogates substantive rights and contravenes Congress's uniform nationwide legal regime for Title VII lawsuits." *Id.* at 826. "[A] contractually shortened limitation period, *outside of an arbitration agreement*, is incompatible with the grant of substantive rights and the elaborate pre-suit enforcement mechanisms of Title VII." *Id.* at 839 (emphasis added).

At least one judge in this District has distinguished *Logan* by noting that it did not involve an arbitration agreement. *See Brown v. Heartland Employment Services, LLC*, 2020 WL 2542009 (E.D. Mich. 2020) (Goldsmith, J.) ("*Logan* provides scant evidence of the Sixth Circuit's willingness to interfere with arbitration agreements"); *see also Thompson v. Fresh Products, LLC*, 985 F.3d 509 (6th Cir. 2021) (The Sixth Circuit further extended its *Logan* reasoning to ADA and ADEA claims holding that "Because it incorporates Title VII's self-contained limitations period, the ADA's time limitation is a substantive right that may not be waived." It is worth noting both the expansion of *Logan*, and that there was no arbitration agreement in *Thompson*.). The *Logan* court spent time distinguishing *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003) (en banc), in which a one-year statute of limitation in the context of an arbitration agreement was

upheld, the court noted that *Morrison* "was primarily concerned with determining circumstances under which courts should invalidate arbitration agreements (or clauses of arbitration agreements)" but the *Logan* court also noted that

> To the extent that footnote sixteen of Morrison establishes a legal principle relevant here, it is this: a one-year limitation period to bring a Title VII claim to arbitration is not unduly burdensome, and therefore such a provision is enforceable. Because the instant case involves a significantly shorter contractual limitation period, Morrison is of little, if any, persuasive force to show that Logan's limitation period is enforceable. But more fundamentally, because the instant case does not involve an arbitration agreement, the underlying logic of Morrison—rooted in enforcement of the FAA—simply does not apply. Therefore, Morrison, like Wolfe and Thurman, is inapposite.

*Logan*, 939 F.3d at 838-39.

The instant case is distinguishable first because it involves an arbitration clause. Second, based on the time between Plaintiff's Charge of Discrimination and right-to-sue letter, the six-month time period could have been complied with had Plaintiff acted expeditiously in filing an actual charge with the EEOC. The record contains a charge of discrimination filed with the EEOC and dated May 13, 2019. (ECF No. 16-6.) According to the parties, the right-to-sue letter was issued on July 18, 2019, approximately two months later. (Compl. ¶ 41.) In this instance the Court finds that the time limitation is not unreasonable and could have been complied with, without limiting Plaintiff's substantive rights under federal law. The Court is mindful, however, that the Sixth Circuit has expanded the application of *Logan* as recently as this year with *Thompson*, and though the cases to date continue to respect time limitations in arbitration agreements, in light of recent and expanding case law in this area, the Court will address all of Defendant's summary judgment arguments. The Court will next consider whether there is a question of material fact as to whether Plaintiff complied with the six-month contractual limitation.

### 3.     Whether Plaintiff Complied With The Six-Month Limitation

Defendant argues that Plaintiff did not file any claim for arbitration or with the EEOC before the six-month limitation period expired on April 3, 2019. Plaintiff responds that she filed an EEOC intake questionnaire "the following month" after her termination and the claims are timely. Plaintiff did not raise the issue of filing the intake questionnaire until responding to Defendant's motion for summary judgment. In her Complaint, Plaintiff alleged that she was terminated on or about October 3, 2018, and that "[o]n or about May 13, 2019, [she] filed a charge of discrimination with the Detroit office of the Equal Employment Opportunity Commission ("EEOC") on the basis of (1) race; and (2) retaliation." (Compl. ¶¶ 39, 40, ECF 1.)

With her response, Plaintiff provides a declaration in which she states, "I first went to the Equal Employment Opportunity Commission in November of 2018 and I filled out, signed, and filed my intake questionnaire that same day." (Hines Decl. ¶1, Pl.'s Resp. Ex. D, ECF No. 16-4.) The declaration is signed by Plaintiff, "under penalty of perjury under the laws of the United States of America." (*Id.* at 9.)

"Before a plaintiff may sue under Title VII in federal court, she must first exhaust her administrative remedies, one component of which is timely filing a 'charge' with the EEOC." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 507-08 (6th Cir. 2011) (citing 42 U.S.C. § 2000e-5(e), (f). Plaintiff relies on *Williams* to argue that an "intake questionnaire" qualifies as a "charge" to the EEOC. The issue is not as easily resolved as Plaintiff allows.

> [I]n order for an EEOC filing to constitute a "charge" that is necessary to exhaust an employee's administrative remedies under Title VII, the filing (1) must be "verified"—that is, submitted under oath or penalty of perjury, 29 C.F.R. § 1601.3(a); (2) must contain information that is "sufficiently precise to identify the parties, and to describe generally the action or practices complained of," id. § 1601.12(b); and (3) must comply with *Holowecki*—that

is, an "objective observer" must believe that the filing "taken as a whole" suggests that the employee "requests the agency to activate its machinery and remedial processes."

*Williams*, 643 F.3d at 509 (citing *Federal Exp. Corp. v. Holowecki*, 552 U.S. 389 (2008)). The Sixth Circuit noted that the Supreme Court added the third of these conditions. "Acknowledging that more than half of the filings the EEOC receives each year are mere informational inquiries rather than enforcement requests, the Court reasoned that the statutory term 'charge' implies that a filing must be the latter." *Williams*, 643 F.3d at 508 (citing *Holowecki*, 552 U.S. at 399-401).

Unlike the Sixth Circuit's analysis in *Williams*, there is no information before this Court from which to determine whether Plaintiff's intake questionnaire "taken as a whole" addressed any of the requirements necessary to be considered a "charge." It is worth noting that in the cases relied upon by Plaintiff in which a court held that filing an EEOC intake questionnaire counted as a charge, the court was provided with the intake questionnaire or the other information provided, from which to make such a determination. *See generally, Holowecki*, 552 U.S. at 404-05 ("Respondent's completed intake form contained all of the information outlined in 29 CFR 1626.8, . . . ." "In this case, . . . the completed questionnaire . . . was supplemented with a detailed six-page affidavit", which, at the end, contained language "properly construed as a request for the agency to act."); *Burus v. Wellpoint Cos.*, 434 Fed. Appx. 475, 477 (6th Cir. 2011) ("The intake questionnaire mentioned that [the supervisor] demoted her, but the EEOC charge did not mention the demotion.").

Aside from her declaration, Plaintiff has provided no evidence from which the Court may determine any of this. In fact, Plaintiff provides at Exhibit F to her response a

document entitled "Charge of Discrimination" that is signed and dated May 13, 2019 and stamped "RECEIVED May 13 2019 U.S. EEOC Detroit Field Office." (ECF No. 16-6.) This document is signed "under penalty of perjury," identifies by position (though not name) the individual she alleges to have discriminated against her based upon her race, and those to whom she made such a complaint, again identified by position and not name. It lacks a further description of the "action or practices" complained of, aside from the firing she believes was in retaliation. She identified the "date(s) discrimination took place" as "10-03-2018", given as the date of both the "earlier"" and "latest" date of discrimination. (ECF No. 16-6.) That is the date of her discharge. There is no date given on the "Charge of Discrimination" document for incidents of racial discrimination alleged in her complaint before this Court. Plaintiff has not shown a genuine dispute as to the fact that her charge of discrimination and retaliation was not filed until May 13, 2019, more than six months after her termination.

The Court finds that Plaintiff's claim is untimely under the arbitration agreement in the Application. As set forth above, due to the evolving nature of recent case law considering the enforceability of contractual time limitations in Title VII claims, and despite the existence of the arbitration agreement in this instance, it is worth considering Defendant's remaining claims for summary judgment.

### B.  Plaintiff's Discrimination Claim

"Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"

*Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (citing 42 U.S.C. § 2000e-2(a)(1)).

A plaintiff may demonstrate discrimination by direct or indirect (circumstantial) evidence. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). To establish a prima facie case of employment discrimination under Title VII using circumstantial evidence, Plaintiff must show that

> 1) [s]he is a member of a protected class; 2) [s]he was qualified for the job and performed it satisfactorily; 3) despite [her] qualifications and performance, [s]he suffered an adverse employment action; and 4) [s]he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of [her] protected class.

*Laster*, 746 F.3d at 727. If a prima facie case is established, the defendant can rebut the presumption of unlawful discrimination by setting forth a "legitimate, non-discriminatory reason" for the challenged employment action. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). Once this is done, the burden shifts back to the plaintiff to show that the articulated reason was a mere pretext for intentional race discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).

The first element is uncontroverted: Plaintiff is a member of a protected class. (Compl. ¶ 7.) Plaintiff also argues that the third element is uncontroverted: she suffered an adverse employment action: she was terminated.[9] (Pl.'s Resp. 19, ECF No. 16.)

---

[9] "In the context of a Title VII discrimination claim, an adverse employment action is defined as a "materially adverse change in the terms or conditions" of employment." *Laster*, 746 F.3d at 727 (citation omitted) (Laster noted that the plaintiff's two-day suspension that was ultimately revoked did not meet the standard of an "adverse employment action"). "An adverse employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

Plaintiff asserts that she was qualified for the position from which she was terminated, and Defendant does not argue the contrary. Plaintiff testified that she earned a master's degree in human resources in 2016. (Hines Dep. 27, ECF No. 16-1.)

Defendant argues that Plaintiff cannot establish a prima facie case of discrimination because there is no evidence that she was treated differently than a similarly situated employee outside of her protected class. (Def.'s Mot. 16, ECF No. 11.) Defendant's argument is based primarily on the fact that Plaintiff was the only employee supervised by Holcomb-Smith. "To be similarly situated, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (citation omitted). And while "[e]xact correlation is not required," they "must be similar in 'all relevant aspects.'" *Id.*

Plaintiff cites cases from the Seventh Circuit to argue that a more lenient standard should be adopted.[10]  Plaintiff does not identify case law from the Sixth Circuit that is similarly lenient regarding whether employees share a supervisor. Despite this, the Court does not apply such a narrow reading of "similarly situated" that an employee occupying a "unique" position would never receive the protections offered by anti-discrimination

---

[10] "[A] plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces. But the comparator must still be similar enough 'to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, [so as to] isolate the critical independent variable: complaints about discrimination.'" *See Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 719 (7th Cir. 2009) (citation omitted).

laws. *See generally Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) ("A prima facie standard that requires the plaintiff to demonstrate that he or she was similarly-situated in every aspect to an employee outside the protected class receiving more favorable treatment removes from the protective reach of the anti-discrimination laws employees occupying "unique" positions, save in those rare cases where the plaintiff produces direct evidence of discrimination. . . . [W]e simply require that the plaintiff demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects.").

Even under an arguably more relaxed standard, Plaintiff gives the Court little evidence with which to compare other employees. In her response, Plaintiff provides identification of only one employee by name: "Pricilla Cacuchi."[11]  (Pl.'s Resp. 21, ECF 16; Hine Decl. ¶¶ 24-26, 28- 31, ECF No. 16-4.) To support this allegation, Plaintiff cites to her own declaration at Exhibit D to her response. In her declaration she stated that Pricilla Cacuchi was making more mistakes than Plaintiff, called off work "a lot", did not have a higher degree than Plaintiff, had less experience than Plaintiff and was getting paid more than Plaintiff. (Hines Decl. ¶26, ECF 16-4.) Plaintiff testified in her deposition that Pricilla was a white female employee who was making one dollar an hour more than Plaintiff, did not have a Master's degree, had informed Plaintiff that she (Pricilla) had less experience than Plaintiff, worked in benefits in H.R., and had "Dawn" as a supervisor, not Holcomb-Smith, yet Colleen had decision-making authority as to how much money both Plaintiff and Pricilla were paid. (Hines Dep. 95-97, ECF No. 16-1.)

---

[11] This spelling of Pricilla Cacuchi as it appears in Plaintiff's response will be used hereinafter. (Pl.'s Resp. 8, 10, 21, ECF No. 16.)

Plaintiff also stated that "the white H.R. analyst and assistant who work in the main administration building are routinely late to work and do not finish their tasks in time, but they are still employed and I was fired for because (sic) of those things." (Hines Decl. ¶ 31.) In her declaration she stated that she "was declined" for a $40,000 salary she was supposed to have received after her 30-day probation period, but that "[n]on-African American employees, such as Pricilla Cacuchi and an ex-employee I cannot think of the name of were also promised this raise after their probationary period, and they received this raise sometimes even before their probationary period ended." (Hines Decl. ¶¶ 23-24, ECF 16-4.)

Despite testimony that Pricilla and unnamed non-African American employees "sometimes" received the raise before the end of their probationary period, the allegation remains unsupported and general, failing to identify specific individuals, the timing or amount of the raise. Further, there is no actual evidence of other employee's positions, experience, education, job responsibilities, disciplinary history, or supervisor with which to make comparisons—only conclusory statements. Plaintiff testified that Pricilla had told her she had been written up but there is no indication what she was written up for. (Hines Dep. 97:18-22.)  Plaintiff provides no basis from which the Court can determine whether these other individuals are similarly situated. *See e.g., Fuelling v. New Vision Med. Labs. LLC*, 284 Fed. Appx. 247, 255-56 (6th Cir. 2008) (In a reverse discrimination case, the Sixth Circuit pointed out that the plaintiff provided no information about the allegedly similarly situated employee—"such as her position, job responsibilities, years of experience, length of tenure at New Vision, or disciplinary history—that would indicate whether [the other employee] and [plaintiff] were similarly situated in all relevant aspects

of their employment," and failed to identify other employees or cite specific instances in which the others engaged in the activity at issue, nor did she assert facts to show they were similarly situated. The Sixth Circuit pointed out that the party opposing summary judgment must present specific facts showing a genuine issue of fact for trial and that "affidavits submitted in support thereof 'must be made on personal knowledge,' Fed. R. Civ. P. 56(e)(1). Under this standard, [the plaintiff] has failed to create a genuine issue of material fact with respect to whether she was similarly situated to the black employees who were allegedly treated better than she was treated. . . . That failure is fatal to her prima facie case.").

With respect to Plaintiff's termination, Plaintiff was unable to identify a replacement employee for her position. Plaintiff testified that "a couple of people told" her that a person was hired to replace her "the next day" after her termination. (Hines Dep. 129, ECF No. 11-5.) There is no further evidence or allegation regarding whether someone was hired to replace her nor evidence that the replacement was not African American. Plaintiff has failed to show a genuine issue of material fact as to whether she was similarly situated to non-African Americans who were treated differently, and whether she was replaced by a non-African American. With respect to this fourth element she has failed to establish a prima facie case of discrimination. This claim will be dismissed.

### C. Plaintiff's Hostile Workplace Claim

To establish a Title VII claim of a racially hostile work environment, Plaintiff must show: "(1) she is a member of a protected class; (2) she was subjected to unwelcomed racial harassment; (3) the harassment was race based; (4) the harassment unreasonably interfered with her work performance by creating an environment that was intimidating,

hostile, or offensive; and (5) employer liability." *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (citation omitted). Plaintiff is a member of a protected class-she is African American. (Compl. ¶ 7, ECF No. 1.) Defendant argues that Plaintiff provides no evidence of the fourth and fifth elements of this claim.

At her deposition, Plaintiff was questioned about what offensive comments or communications she was subjected to on the basis of her race or national origin. (Hines Dep. 139, ECF No. 16-1.) Plaintiff's testimony was as follows regarding an interaction with Holcomb-Smith:

> Q: She never said "black," she pointed to the skin color; is that what you're saying?
>
> A: No, that's what I just said. I just said she said: For you to be black, young and black do you have – you have a bachelor's degree, not a master's degree, right?
>
> Q: Okay. So she said "black" and she pointed to her skin or to your skin?
>
> A: She rub her skin tone. She did just like this.
>
> Q: Okay. And she's a black woman, correct?
>
> A: Correct.
>
> Q: Any other examples of her making what you consider to be offensive communication or conduct because of your race or national origin?
>
> A: Nothing that I can think of right now.
>
> Q: Okay. Do you believe that you were subjected to an intimidating, hostile, or abusive work environment because of your race or national origin?
>
> A: By my race.
>
> Q: Okay. And what led you to believe that?
>
> A: Because of the same statement.
>
> Q: Okay. Any other examples?
>
> A: Nothing I can think of right now.
>
> . . .
>
> Q: Okay. When you complained about Shana to Dawn or Angelina, did you ever mention this situation, this comment that you just alleged?
>
> A: I don't remember mentioning it. I don't know.

Q: Did you ever witness Shana do anything that you thought was racist?

A: That was the only comment.

Q: Okay. Did you feel like you were subjected to a hostile work environment?

A: Yes.

Q: Why?

A: The same information.

(Hines Dep. 140:15-142:8.) Taking this testimony in the light most favorable to Plaintiff, the Court considers the fourth and fifth elements of such a claim.

"In order to satisfy the fourth prong of the prima facie case, the plaintiff must present evidence showing that under the 'totality of the circumstances' the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Clay*, 501 F.3d at 707 (citations omitted). The severe or pervasive requirement "requires the court to examine, under the totality of the circumstances, 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" *Id.* (citations omitted). "The Supreme Court recently explained that "[a] hostile work environment ... typically comprises a succession of harassing acts, each of which 'may not be actionable on its own.' In addition, a hostile[-]work[-]environment claim 'cannot be said to occur on any particular day.'" *Id.* at 708 (citing *Ledbetter v. Good Year Tire & Rubber Co.*, 550 U.S. 618 (2007)).

Holcomb-Smith pointed to her skin and referred to Plaintiff's race once when calling into question Plaintiff's education credentials. The Court considers this single race-related comment in the context of Plaintiff's allegations, including being given personal

errands to perform for Holcomb-Smith, alleging other questions about her education credentials, and being "forced to hear her supervisor refer to herself as the Queen B****," and finds that the conduct was not severe or pervasive enough as a matter of law. *See Clay*, 501 F.3d at 707 (we have earlier affirmed grants of summary judgment, determining that as a matter of law, the conduct complained of was not sufficiently severe or pervasive"). Even if the Court were to find that Plaintiff had raised a question of fact on this issue, she has not presented evidence as to the fifth element: "[S]he must then prove that her employer 'tolerated or condoned the situation' or 'that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action.'" *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir. 1999) (citations omitted).

It is unclear when and to whom Plaintiff reported her issues with Holcomb-Smith, and by her own testimony she is not even sure that she mentioned the one incident on which she bases the allegation that the behavior of which she complains was race-based. Nor has she presented evidence to demonstrate that harassment was so pervasive that the Defendant should have known about it.

Even if the Court were to conclude that Plaintiff showed treatment severe and pervasive enough to create a hostile work environment, she has shown no way in which the employer "knew or should have known" about the harassment. Plaintiff has failed to establish a prima facie case of hostile work environment. This claim will be dismissed.

### D.  Plaintiff's Retaliation Claim

In the absence of direct evidence of retaliatory motive, Plaintiff's claim of retaliation is properly analyzed under the familiar *McDonnell Douglas* burden-shifting approach articulated by the Supreme Court. *See McDonnell Douglas Corp.*, 411 U.S. at 804. At the

first step, Plaintiff must establish each of the four elements of a prima facie case of retaliation: (i) that she "engaged in activity protected by Title VII;" (ii) that "this exercise of protected rights was known to" Defendant; (iii) that Defendant "thereafter took adverse employment action against [Plaintiff], or [she] was subjected to severe or pervasive retaliatory harassment by a supervisor;" and (iv) that "there was a causal connection between the protected activity and the adverse employment action or harassment." *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 595 (6th Cir. 2007) (citation omitted). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Defendant disputes only whether there was a causal connection between the protected activity and termination of Plaintiff's employment. (Def.'s Mot. 24.) Defendant argues that Plaintiff has not shown the final element, proof of "but-for" causation: a causal connection between the protected activity and the adverse employment action. *See Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). Defendant correctly points out that evidence is lacking that "multiple grievances" were filed against Holcomb-Smith, there is testimony by Plaintiff that she did not utilize Red Flag Reporting option that was available in Defendant's nonharassment policy, and she was unsure that she mentioned the skin-pointing incident at all.[12] (Def.'s Mot. 24; Hines Dep. 93, 141:22-25.)

---

[12] In her response, Plaintiff alleges that she "brought her issues directly to human resources on multiple occasions, specifically mentioning race each time." (Resp. 8, citing Hines Decl. 14, 33, 34, ECF No. 16-4.) As set forth above, however, Plaintiff testified that the race-based allegations she made in her complaint were based on the skin-pointing incident and that she did not have any other examples of "offensive communication or conduct" because of her race. (Hines Dep. 140:25-141:11, ECF No. 16-1.) She then testified that she did not remember mentioning that very comment and

There are certain cases "where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008) (reconciling two lines of cases: "Where an adverse employment action occurs very close in time after an employer learns of a protected activity" and "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action.").

Plaintiff's May 13, 2019 Charge of Discrimination as filed with the EEOC states that "[i]n August 2018" she "made a complaint to the General Manager and the Benefits Manager" that she believed her supervisor was discriminating against her based on her race. (Def.'s Mot. Ex. J, ECF No. 11-11.) This appears to be the only complaint or report for which an approximate date of complaint is given, it identifies the people—if only by title-- to whom the complaint was made, and it alleges race-based discrimination. In this instance the proximity in time between the August 2018 complaint mentioned in the Charge of Discrimination (and Plaintiff's termination in October 2018, just two months later, is sufficient in the summary judgment context in this instance to establish the causal connection element of the retaliation claim.

Admittedly, it is a close call as to whether the temporal proximity of these actions should demand other evidence of causation, but the chronology of an August 2018

---

situation in her complaint to Dawn or Angelina. (Hines Dep. 141:22-25, ECF No. 16-1.) To the extent Plaintiff uses her declaration to allege that she mentioned race on "multiple occasions" in complaints to human resources, "a party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony." *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998).

complaint to managers about race-based discrimination precedes by only a month the first of the Employee Performance Records (EPR) on September 18, 2019. (Def.'s Mot. Ex. G, ECF No. 11-8). In quick succession, there is a September 21, 2018 "~~30~~ Day Performance Improvement Follow-up" concluding Plaintiff's overall score (performance) as "Needs Improvement" and the Employee Performance Record memorializing a termination on October 4, 2018. (Def.'s Mot. Exs. H, I, ECF No. 11-9, -10 (strike-through in exhibit).) It is worth noting that a "90 Day New Hire Evaluation dated July 13, 2018 (prior to the August 2018 complaint) concluded that Plaintiff's overall score was "Meets Expectations." (Def.'s Mot. Ex. F, ECF No. 11-7.) In this instance the temporal proximity is sufficient to establish causal connection.

Although Plaintiff does not remember whether she complained about the skin pointing incident, if she had generally alleged racial discrimination to these two managers in August 2018, as supported by her charge of discrimination, the Court could find that she has, for purposes of summary judgment, established that she engaged in a protected activity and that defendant knew about that activity. Further, Plaintiff has shown adverse employment action taken against her, supported by her own testimony, and her eventual termination from her position with Defendant.

With Plaintiff having established a prima facie claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action. *See Mickey*, 516 F.3d at 526. Defendant has shown a legitimate and documented reason for terminating Plaintiff: poor work performance. The September 2018 Employee Performance Record (EPR) and the Performance Improvement Follow-Up, as well as the October 2018 EPR terminating Plaintiff's employment all contain details as to the specific

areas where expectations were not being met.  These are found in the "comments" section of the EPRs and in the "Supervisor Feedback" section of the Performance Improvement Follow-up, discussed in further detail below. (ECF Nos. 11-8, 11-9, 11-10.) Defendant has articulated a nondiscriminatory reason for disciplining and terminating Plaintiff, so now Plaintiff may "show that the defendant's stated reason 'is merely a pretext for discrimination.'" *Mickey*, 516 F.3d at 526 (citations omitted). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000)).

To argue pretext, Plaintiff references the pretext arguments she made in support of her discrimination claim. (Pl.'s Resp. 25.) First, Plaintiff alleges that a "shoddy investigation could be a sufficient showing of pretext," and alleges there was never an investigation into the "corrective action Plaintiff received." (Pl.'s Resp. 22, ECF No. 16.) She relies on *Hendershott v. St. Luke's* Hospital, to argue that "the employee must show that a reasonable jury could, based on the failure to conduct a deeper investigation, conclude that the investigation was a sham." *Hendershott*, 2020 WL 60187, at *9 (N.D. Ohio Jan. 6, 2020). She alleges she was "never interviewed or given a follow-up statement regarding her disputes as to the stated reasons for termination or any of her complaints to HR." (Pl.'s Resp. 22, ECF No. 16.) She goes on to argue that Holcomb-Smith testified that no one informed her that Plaintiff had reported her. (Pl.'s Resp. 22; Smith Dep. 116:1-3.)

This premise in *Hendershot* is distinguishable in that it relates to a "pre-termination" investigation into the accusations levied against the plaintiff by other employees and the resultant disciplinary process. Here, the Court has no information about an investigation, but the disciplinary and review documents show specific areas of work-related tasks that Plaintiff was directed to improve or change. For example, as far back as the July 2018 90-Day New Hire Evaluation, she was advised to improve her knowledge of Microsoft Excel, and this was one of the items again mentioned in the October 2018 EPR terminating her employment. (ECF 11-7). Issues related to recruitment processes and double-checking work product continued to be noted throughout as well. (ECF Nos. 11-8, 11-9, 11-10).

Plaintiff also relies on *Parker v. Key Plastics, Inc.*, 68 F.Supp.2d 818 (E.D. Mich. 1999), to argue that deviation from policy can be evidence of pretext. First, Plaintiff argues that allegations levied upon her should have been investigated. This is akin to her argument above, related to *Hendershott*, and fails to show pretext for the same reasons. Second, she argues that under Defendant's anti-harassment policy, "Plaintiff's other reports should have been investigated." (Resp. 22.) The Court agrees with Plaintiff that there was no evidence of an investigation. But similarly, there is no evidence to show how many times, when, to whom, and what specifically Plaintiff reported that would have been included in Defendant's anti-harassment policy, with the possible exception of the date of the complaint mentioned in the EEOC Charge document. Plaintiff testified that she did not "think of" following Defendant's "Red Flag Reporting" option in Defendant's nonharassment policy. (Hines Dep. 93; Def.'s Mot. Ex. B, ECF No. 11-3.) She admits she

is not sure if she reported the skin-pointing incident. Plaintiff fails to develop her argument to show how Defendant failed to follow its policy.

Plaintiff cites *Thurman v. Yellow Freight Systems, Inc.*, to argue that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996). The context of this quote in *Yellow Freight* was that of the defendant changing its factual position as litigation continued. *Id.* Plaintiff points to no specific basis to allege that Defendant has changed its rationale (or its position regarding that rationale) for terminating her: work performance. Plaintiff relies on *Hall v. Eastman Chemical Co.*, to argue that a defendant setting an employee up for failure is evidence of pretext. *See Hall v. Eastman Chemical Co.*, 136 Fed. Appx. 730, 733 (6th Cir. 2005); (Pl.'s Resp. 22). *Hall*, however, states that evidence of being "set up to fail" could be used to show causation in setting forth a prima facie case; it does not speak to pretext.

Plaintiff also argues that the "rapid pace" of the write-ups, coupled with Plaintiff's credentials and a lack of negative work critiques prior to the write-ups, as well as the fact that Holcomb-Smith had never written-up another employee, is further evidence that "work performance" as an excuse is actually pretextual. (Pl.'s Resp. 23, ECF No. 16.) Plaintiff argues that it was "not until after she began reporting Ms. Holcomb-Smith" that she received her first write-up. (Pl.'s Resp. 23.) As set forth above, aside from the allegation in the EEOC Charge of Discrimination, due to lack of evidence it remains unclear when, how and to whom Plaintiff made complaints about Holcomb-Smith. Plaintiff was given a job description on June 29, 2018, which she signed. The description indicated that she would have a review in 60 days: September 3, 2018. (Job Description, ECF No.

11-6.) The July 13, 2018 90-Day New Hire Evaluation, while noting that her overall performance score was "meets expectations," also noted areas that needed continuing work and were mentioned in the later EPRs and evaluations, such as using Excel, double checking work and reducing errors. (ECF No. 11-7, 11-9, 11-10.) On August 20, 2018, Plaintiff signed an EPR stating that "effective Wednesday, 8/15/2018, Cynthia has taken on full responsibility of all her job duties, except Excel Reports, that will start Wednesday, 8/22/18." (ECF No. 16-5.) The performance issues were well-documented.

The Court finds that Plaintiff has not shown evidence of pretext. The Court will dismiss her retaliation claim.

## IV.    Conclusion

For the reasons stated herein, the Court GRANTS Defendant's motion for summary judgment (ECF No. 11) and dismisses Plaintiff's remaining claims and complaint with prejudice.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: March 25, 2021


I hereby certify that a copy of the foregoing document was served upon counsel of record on March 25, 2021, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager